# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| SAMUEL QUINN, | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) 14-cv-6633 |
| DR. SALEH OBAISI, and WEXFORD HEALTH SOURCES, INC., | ) ) ) ) |
| Defendants. | ) Judge John Z. Lee ) ) ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Samuel Quinn, an inmate at Stateville Correctional Center, brought this action under 42 U.S.C. § 1983 against Dr. Saleh Obaisi, claiming that he violated the Eighth Amendment's prohibition on cruel and unusual punishment through deliberate indifference to Quinn's pain and need for treatment resulting from hemorrhoids and anal fissures. Quinn is also suing Wexford Health Sources, Inc., the corporation contracted to provide medical care to inmates at Stateville. Defendants have filed a motion for summary judgment. For the reasons given below, Defendants' motion is denied.

## Factual Background[1]

Defendant Wexford Health Sources, Inc. is a medical contractor that provides medical services to inmates at Stateville Correctional Center. Defs.' LR 56.1(a)(3)

---

[1] The following facts are undisputed or have been deemed admitted, unless otherwise noted.

Stmt. ¶ 2. Defendant Saleh Obaisi is a physician and Wexford employee who became the medical director at Stateville in August 2012. *Id.* Obaisi oversees all physicians, physicians' assistants, nursing staff, and medical departments at Stateville. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 4.

I.  **Quinn's Interactions with Dr. Obaisi**

Quinn entered Stateville in 2007. Defs.' LR 56.1(a)(3) Stmt. ¶ 1. In December 2011, Obaisi's predecessor referred Quinn to the University of Illinois Medical Center ("UIC") gastrointestinal clinic based on Quinn's history of abdominal pain and liquid stools mixed with blood. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 1. UIC recommended that Quinn receive a colonoscopy, *id.* ¶ 2, which he then received at UIC on February 29, 2012, Defs.' LR 56.1(a)(3) Stmt. ¶ 4. Quinn was diagnosed at that time with nonthrombosed, nonbleeding hemorrhoids. *Id.*

Approximately two years later, on May 12, 2014, Obaisi submitted a referral for Quinn to return to UIC for evaluation for a potential hemorrhoidectomy. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 7. The comments on the referral described Quinn as having stage 4 hemorrhoids with constant prolapse, bleeding and pain. *Id.* The appointment at UIC occurred exactly six months later, on November 12, 2014. *Id.* ¶ 8.

At that appointment, UIC physician Dr. Vivek Chaudhry noted that Quinn had grade 2 hemorrhoids and an anal fissure and that Quinn complained of pain and blood upon stooling, as well as constipation. *Id.* ¶ 9. Chaudhry recommended an increase in dietary fiber, a return in three months to re-evaluate the healing of

2

the fissure, and he prescribed an ointment to treat the anal fissure. Defs.' LR 56.1(a)(3) Stmt. ¶ 5.

Six days later, on November 18, 2014, in accordance with Chaudry's recommendation, Obaisi created a referral for Quinn to return to UIC in three months. *Id.* ¶ 6; Pl.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 10, 11. Quinn then had a follow-up appointment at UIC on March 18, 2015. *Id.* At that appointment, he reported to Dr. Chaudhry that since the time he had started using the nifedipine ointment to treat the anal fissure, he no longer had "pain secondary to his fissure." Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 14. Dr. Chaudhry wrote in a clinical note that Quinn was still complaining of occasional hemorrhoid prolapse, that his fissure had appeared to heal, and that he should "RTC [return to clinic] for hemorrhoid banding."[2] *Id.* ¶ 15. Chaudhry later testified that the amount of time in which patients typically return for a banding procedure to remove hemorrhoids varies, generally from one to six months. Defs.' LR 56.1(a)(3) Stmt. ¶ 37.

The same day that he returned from the UIC appointment, Quinn visited with Obaisi at Stateville, and Quinn made no complaints to Obaisi. Defs.' LR 56.1(a)(3) Stmt. ¶ 8. Obaisi also signed a form indicating that he had read Chaudhry's March 2015 clinical note with the observations and recommendations described above. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 17. Obaisi's visit assessment notes

---

[2] Defendants assert that the March 2015 clinical note states that Quinn was discharged with a recommendation for a high fiber diet, a colonoscopy in ten years, and follow-up as needed with the GI clinic. Defs.' LR 56.1(a)(3) Stmt. ¶ 7. However, as Quinn points out, this portion of the note merely restated the assessment and recommendation from Quinn's February 2012 visit to UIC. Defs.' LR 56.1(a)(3) Stmt., Ex. E, CRS Clinic Note Dated Mar. 18, 2015, ECF No. 109-5 at 53.

3

"med writ referral to have Hemorrhoid banding," and he prescribed the pain reliever Voltaren to Quinn. *Id.* ¶ 18. A Wexford patient record for Quinn shows that a referral for hemorrhoid banding was then approved at collegial review six days later, on March 24, 2015. *See* Defs.' LR 56.1(a)(3) Stmt., Ex. E, Authorization Comments Dated Mar. 24, 2015, ECF No. 190-5 at 40.

What happened over the next four months—between March 24, 2015, and late July 2015—is in dispute. Quinn contends that, between March and August, he made multiple appointment requests but the health staff told him that Obaisi would tear up his requests and throw them in the garbage. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 35. It is undisputed that, as of late July 2015, no appointment had yet been scheduled for Quinn to return to UIC, whether for hemorrhoid banding or any other treatment. *Id.* ¶ 22. At that time, Quinn went on a hunger strike, claiming that it was due to pain and lack of medical treatment. *Id.*

The parties dispute whether Quinn's stated reasons for the strike were genuine, Defs.' Resp. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 22, and they dispute the extent to which Quinn made Obaisi aware of his pain during this period. *Id.* ¶ 23. Obaisi saw Quinn on July 28, 2015 (the first time since March), and he did not treat Quinn for hemorrhoids or anal fissure at that time. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 24. According to Quinn, Obaisi told him at this visit that Obaisi's understanding was that there was nothing wrong with Quinn and that he just needed to continue with a fiber diet and get a colorectal exam every ten years. *Id.* ¶ 25.

The next day, Quinn told Stateville staff members that he wanted to kill himself and was feeling helpless because he wasn't getting treatment for his medical concerns, physicians were refusing to treat him, and he would rather be dead than put up with the pain he was feeling. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 27. Two days later, Quinn made a similar report to a mental health professional at Stateville. *Id.* ¶ 28. Three days later, he made another report to a mental health professional that his "stomach back + butt" were in pain and was still carrying out a hunger strike until his medical needs were met. *Id.* ¶ 29.

Several days later, on August 6, 2015, Obaisi saw Quinn again. *Id.* ¶ 30. Obaisi reported in his notes that Quinn was feeling pain from an anal fissure which had returned, and he noted that the fissure was chronic. *Id.* ¶ 30. Obaisi gave Quinn a steroid injection to treat the anal fissure.[3] *Id.* ¶ 31. He also prescribed Depo-Medrol for the anal fissure. Defs.' LR 56.1(a)(3) Stmt. ¶ 9.

On August 17, 2015, physician's assistant LaTanya Williams saw Quinn and determined that he had an anal fissure and hemorrhoids. *Id.* ¶ 10. She prescribed ointment, a dietary supplement for fiber intake, and Zantac for indigestion. *Id.* ¶ 11. Her recommendation was for Quinn to return to the healthcare unit as needed. *Id.*

---

[3] Quinn also claims that Obaisi did not prescribe nifedipine ointment, despite UIC recommending that Quinn continue the ointment treatment. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 31. However, the copy of the exhibit provided to the Court to demonstrate UIC's recommendation is illegible. Defs.' LR 56.1(a)(3) Stmt., Ex. A, ECF No. 109-1 at 168 (displaying "IDOC 456" at bottom right of page).

Approximately four weeks later, Williams wrote in a progress note that Quinn complained he had not received the ointment she had prescribed for his fissure. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 32. Williams assessed that Quinn had a recurrent anal fissure and hemorrhoids and wrote that an order was needed for ointment. *Id*. She further wrote "Recommended by UIC GI clinic, [history] of recurrent anal fissure. Hemorrhoid banding pending fissure healing." *Id*. ¶ 32.

On October 14, 2015, a Wexford employee recorded that no appointment at UIC had been scheduled for Quinn. *Id*. ¶ 37. Defendants admit that there is no evidence that Obaisi followed up to see if an appointment had been scheduled during the intervening seven-month period after the referral was approved in March. Defs.' Resp. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 37. They instead contend that: 1) it was UIC's responsibility to set appointment dates; and 2) Obaisi's duties do not include scheduling appointments for inmates at UIC. *Id*.; Defs. LR 56.1(a) Stmt. ¶¶ 21, 22, 23. Obaisi testified that it was common practice for him to meet with inmates who are waiting for a UIC appointment to be scheduled "as a reminder to myself . . . to see if we will have a date." Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 36.

Obaisi again saw Quinn on October 22, 2015. He wrote in a progress note that "hemorrhoids were still causing discomfort." Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 38. He did not examine Quinn's hemorrhoids at this visit. *Id*. Obaisi testified that, as of this visit, he knew that Quinn had been referred to UIC and that Quinn had not yet had that appointment at UIC. *Id*. ¶ 39. Obaisi also testified that it was not

necessary to perform a hemorrhoids examination at each visit with Quinn because hemorrhoids do not change quickly over time. Defs.' LR 56.1(a)(3) Stmt. ¶ 14.

Quinn eventually had an appointment at UIC with Dr. Chaudhry, on November 19, 2015. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 40. Dr. Chaudhry wrote in his notes that he had recommended in March 2015 that Quinn come back "for hemorrhoid banding/ligation but failed to follow-up." *Id.* Chaudhry found that Quinn had "internal hemorrhoids on all quadrants, with a large hemorrhoid on left lateral." *Id.* ¶ 41. He also wrote that the hemorrhoid was now "too large to band/ligate to attain reasonable efficacy. This was explained to the patient, and was offered to have a surgical removal . . . in the operating room." Defs.' LR 56.1(a)(3) Stmt., Ex. B, Surgery Notes, ECF No. 109-2 at 102. Quinn elected to receive the surgery. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 42.

Chaudhry testified that surgical removal is more painful than a banding procedure and has a longer and more painful recovery period. *Id.* ¶ 43. Chaudhry also explained to Quinn that the surgery entailed risk of infection, bleeding, and a possible need for reoperation. *Id.* ¶ 44. Chaudhry also testified that a banding procedure is usually painless and does not require anesthesia, numbing, or extensive recovery. *Id.* Quinn underwent surgery on January 13, 2016, and Quinn testified that he experienced constant extreme pain and bleeding after surgery. *Id.* ¶ 46.

II. **Defendant Wexford's Policies and Practices**

7

Wexford's policies state that "Wexford strives to ensure that approved services are completed in a timely manner using approved contracted providers." *Id.* ¶ 48. They employ an "auth-to-actual" protocol to check to see that authorized appointments and procedures actually occurred. *Id.* ¶ 49–51. Wexford policy states that, if authorized services have not occurred within ninety days after a referral, personnel should follow up to see why that is the case.[4] *Id.* ¶ 52.

Dr. Fisher, Wexford's corporate medical director and Rule 30(b)(6) designee, Defs.' LR 56.1(a)(3) Stmt. ¶ 49, testified that, in practice, after the ninety-day window expired, Wexford personnel did not follow up to schedule the appointment, but rather the patient's WexCare notes were simply updated to note this. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 55. Dr. Fisher testified that Wexford "should be checking to make sure that these authorizations actually occur" and that its efforts to improve the auth-to-actual protocol were ongoing. *Id.* ¶ 56.

**Legal Standard**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Shell v. Smith*, 789 F.3d 715, 717 (7th Cir. 2015). To survive summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986),

---

[4] Defendants contend that one of the exhibits upon which Plaintiff relies does not support this factual contention, but the cited portion of Exhibit K does. *See* Pl.'s LR 56.1(b)(3)(C) Stmt., Ex. K, Utilization Management Policies and Procedures, ECF No. 121-1 at 4.

8

and instead must "establish some genuine issue for trial such that a reasonable jury could return a verdict in her favor." *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012). The evidence considered for summary judgment "must be admissible if offered at trial, except that affidavits, depositions, and other written forms of testimony can substitute for live testimony." *Malin v. Hospira, Inc.*, 762 F.3d 552, 554–55 (7th Cir. 2014). The Court gives the nonmoving party "the benefit of conflicts in the evidence and reasonable inferences that could be drawn from it." *Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 794 (7th Cir. 2013). The Court must not make credibility determinations or weigh conflicting evidence. *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010).

## Analysis

Quinn claims that Obaisi acted with deliberate indifference to his medical needs when Obaisi failed to treat Quinn's progressing hemorrhoids and recurrent anal fissure, and to ensure that an appointment for a hemorrhoid-banding procedure at UIC was timely scheduled. In response, Defendants make two primary arguments. First, they argue that no reasonable jury could find that Plaintiff has established the requisite elements of his deliberate indifference claims. Second, they contend that, even if the Court were to find that Quinn has provided sufficient evidence for his claims to proceed to trial, Obaisi is entitled to qualified immunity.

Quinn also contends that Wexford is liable for deliberate indifference because it had a widespread practice of failing to ensure that referral appointments for

9

outside procedures were actually scheduled, resulting in increased and prolonged pain to inmate patients. Defendants contend that no reasonable jury could find that Wexford had such a practice.

Finally, Defendants seek summary judgment on the question of whether Quinn can seek punitive damages. The Court will address each of these arguments in turn.

I. **Defendant Obaisi**

Deliberate indifference to a prisoner's medical needs can violate the Eighth Amendment's prohibition on cruel and unusual punishment, which is "applicable to state officials and employees by interpretation of the Fourteenth Amendment's due process clause." *Dobbey v. Mitchell-Lawshea*, 806 F.3d 938, 940 (7th Cir. 2015) (citing *Estelle v. Gamble*, 429 U.S. 97, 101, 104 (1976)). To prove a claim under 42 U.S.C. § 1983 for deliberate indifference, a plaintiff must establish both objective and subjective components. *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011). First, he must show that his medical need was objectively serious. *Id.* Second, "the plaintiff must show that the defendant[s] [ ] had a sufficiently culpable state of mind—that their acts or omissions [were] sufficiently harmful to evidence deliberate indifference to his serious medical needs." *Pittman ex rel. Hamilton v. Cty. of Madison*, 746 F.3d 766, 775–76 (7th Cir. 2014) (citing *Estelle*, 429 U.S. at 106) (internal quotation marks omitted). In addition, when an inmate brings a deliberate indifference claim based upon delay of medical treatment, the inmate not only must prove the objective and subjective components of his claim, but also must

offer "verifying medical evidence" that the delay caused harm. *Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008); *Williams v. Liefer*, 491 F.3d 710, 715 (7th Cir. 2007).

### A. Subjective Deliberate Indifference

As an initial matter, Defendants do not contend that Quinn has failed to offer evidence from which a reasonable jury could find that he suffered from an objectively serious medical need. Rather, they contend that Quinn has not presented any evidence that Obaisi acted with subjective deliberate indifference.

Deliberate indifference is proved by demonstrating that a prison official knows of a substantial risk of harm to an inmate and "either acts or fails to act in disregard of that risk." *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011). A showing of a defendant's mere negligence or inadvertence is insufficient. *Roe*, 631 F.3d at 857. Instead, the official must have been "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and must also have actually drawn that inference. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "Even where a defendant denies having been aware of a substantial risk of serious harm, summary judgment is inappropriate when a reasonable jury could conclude from other evidence that this was not so." *Torres v. Wexford Health Sources, Inc.*, No. 12 C 8389, 2016 WL 5373060, at *7 (N.D. Ill. Sept. 26, 2016). "A reasonable jury can infer a defendant's subjective deliberate indifference based upon evidence that the defendant ignored a request for treatment, substantially departed from accepted professional standards, failed to follow advice from a

11

specialist, persisted in an ineffective course of treatment, or inexplicably delayed treatment." *Williams v. Ghosh*, No. 10 C 162, 2017 WL 3780315, at *6–7 (N.D. Ill. Aug. 31, 2017) (citing *Petties*, 836 F.3d at 729–31).

Here, Quinn has presented evidence that he had requested a number of appointments with Obaisi for his condition after March 2015, when Obaisi had determined that Quinn's anal fissure had healed, that no medical staff saw Quinn until the next time Obaisi saw him in late July 2015, after his hunger strike, and that health staff told Quinn that Obaisi threw away the interim appointment requests. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 34, 35. Therefore, a reasonable jury could find that Obaisi was aware of Quinn's continuing problems with his anal fissure, yet failed to see or treat Quinn for a considerable period of time. This is sufficient for Quinn to survive summary judgment on this claim.

Additionally, a reasonable jury could find on this record that Obaisi became aware by late July that Quinn's appointment for the banding procedure at UIC had not been scheduled, yet Obaisi failed to take corrective action for several more months. First, Obaisi stated in testimony that he had a practice of attempting to ensure that unscheduled referral visits would get scheduled, thereby allowing a jury to infer that he would generally make himself aware of unscheduled referrals.[5] Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 36. Second, a jury could reasonably infer that Obaisi

---

[5] Wexford contends that Obaisi was not responsible for the "paperwork" of scheduling patient appointments at UIC, but Obaisi testified that he would follow up with patients to see if appointments had been made and, if not, he would make calls to speed up the process. Defs.' LR 56.1(a)(3) Stmt., Ex. A, Obaisi Dep. at 45–46, ECF No. 109-1.

12

would have reviewed Quinn's records in conjunction with the appointment in late July 2015 and again in early August 2015, indicating that his appointment was overdue. And, at a minimum, a reasonable jury could find that Obaisi was reminded of this when Quinn submitted the multiple appointment requests between March and July 2015. *See* Pl.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 34, 35.

Accordingly, Quinn has provided evidence from which a reasonable jury could conclude that Obaisi acted with subjective deliberate indifference when he failed to take steps to ensure that Quinn returned to UIC in a timely fashion as recommended by Chaudhry in March 2015.

### B. Verifying Medical Evidence

Defendants further argue that Quinn has not presented any evidence to show that the delay in treatment exacerbated his injury. When an inmate brings a deliberate indifference claim based upon delay of medical treatment, the inmate must offer "verifying medical evidence" that the delay caused harm. *Grieveson*, 538 F.3d at 779; *Williams*, 491 F.3d at 715. A delay causes harm when it "exacerbate[s] the injury or unnecessarily prolong[s] an inmate's pain." *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010). "A non-trivial delay in treating serious pain can be actionable even without expert medical testimony showing that the delay aggravated the underlying condition." *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010) (citing *Grieveson*, 538 F.3d at 779). "Verifying medical evidence" is evidence such as medical records or physician's notes that "tend [ ] to confirm or corroborate a claim that the delay was detrimental." *Williams*, 491 F.3d at 715; *see,*

13

*e.g.*, *Petties*, 836 F.3d at 732 (finding sufficient verifying medical evidence that a delay in treatment caused harm where the plaintiff offered his doctor's treatment notes indicating that plaintiff was suffering from pain); *Grieveson*, 538 F.3d at 779 (finding that a doctor's treatment notes qualified as verifying medical evidence where they confirmed that an inmate was suffering from a painful condition, because such documentation would "help a jury determine whether the delay unnecessarily prolonged and exacerbated [the plaintiff's] pain").

Here, Plaintiff has offered sufficient verifying medical evidence to show that the eight-month gap between when the UIC doctor recommended that Quinn return for a banding procedure and his actual return to UIC exacerbated and prolonged his pain. Chaudhry's records from Quinn's November 2015 visit noted that Quinn's hemorrhoids had grown and were too large for the banding procedure that Chaudhry had previously recommended, Defs.' LR 56.1(a)(3) Stmt., Ex. B, Surgery Notes at 102, and he described Quinn as having failed to follow up on his March 2015 recommendation, Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 40. Chaudhry testified that a banding procedure is usually painless and does not require anesthesia, numbing, or extensive recovery. *Id*. ¶ 44. By contrast, Chaudhry testified that surgical removal is more painful and has a longer and more painful recovery period than a banding procedure. *Id*. ¶ 43. Chaudhry also explained to Quinn that the surgery entailed risk of infection, bleeding, and a possible need for reoperation. *Id*. ¶ 44. And Quinn testified that he experienced constant extreme pain and bleeding after the surgery. *Id*. ¶ 46.

This evidence is sufficient for a reasonable jury to find that the delay in the treatment of Quinn's hemorrhoid condition created significant additional pain that Quinn would not otherwise have endured. Additionally, Obaisi's own progress note from October 2015—seven months after the referral date—stated that "hemorrhoids were still causing discomfort" to Quinn. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 38. This is sufficient evidence for a reasonable jury to determine that Obaisi's conduct also prolonged existing pain from hemorrhoids.

Finally, on August 6, 2015, Obaisi wrote in his appointment notes that Quinn was feeling pain from an anal fissure which had returned, and Obaisi noted that the fissure was chronic. *Id.* ¶ 30. This is sufficient corroborating medical evidence to show that Quinn suffered prolonged pain from his anal fissure during the time that (according to Quinn's testimony) Obaisi ignored his requests for further medical treatment.

### C. Qualified Immunity

Defendants further contend that they are entitled to qualified immunity with regard to Quinn's deliberate indifference claims against Obaisi. "[Q]ualified immunity shields an official from liability for civil damages, provided that the illegality of the official's conduct was not clearly established at the time he acted." *Roe*, 631 F.3d at 858; *accord Pearson v. Callahan*, 555 U.S. 223, 231 (2009). In determining whether a right was "clearly established" at the time of Defendants' conduct, the Court must look at the right in a particularized sense, rather than at a high level of generality. *Roe*, 631 F.3d at 858. "As the Supreme Court [ ] has

emphasized, however, there is no need that the very action in question have previously been held unlawful." *Id.* (quoting *Safford Unified Sch. Dist. v. Redding*, 557 U.S. 364, 377 (2009)) (internal quotation marks and brackets omitted).

According to Defendants, Obaisi could not have been on notice that any of his exact actions or inactions were violations of the law. Defs.' Mem. Supp. at 13. However, *Roe*, 631 F.3d at 858, forecloses that argument. Moreover, prisoners have had a clearly established constitutional right to timely treatment of their objectively serious medical conditions since *Estelle v. Gamble*, 429 U.S. 97 (1976), was decided. *See Gutierrez v. Peters*, 111 F.3d 1364, 1371 (7th Cir. 1997) ("This Court's post-*Estelle* decisions, as well as those of the other circuit courts, have repeatedly recognized that delays in treating painful medical conditions that are not life-threatening can support Eighth Amendment claims."); *Langston v. Peters*, 100 F.3d 1235, 1240 (7th Cir. 1996) ("As *Estelle* recognized, a prison official may evidence deliberate indifference by failing to treat or delaying the treatment of a serious medical need.").

Additionally, the Seventh Circuit has held that qualified immunity does not apply to private medical personnel in prisons, and there is no dispute that Obaisi, as Wexford's employee, is private medical personnel. *See Petties*, 836 F.3d at 734 (citing *Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 794 (7th Cir. 2014)). Obaisi is therefore not entitled to summary judgment on grounds of qualified immunity in this matter.

**II. Defendant Wexford Health Sources, Inc.**

A corporation that has contracted to provide prisoners with medical care may be liable under § 1983. *Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 927–28 (7th Cir. 2004) (holding that *Monell* liability standard applies to corporations as well). To proceed to trial against Wexford on his claim, Quinn must offer evidence creating a genuine issue of material fact that a policy, custom, or practice of Wexford was the "direct cause" or "moving force" behind the constitutional violation. *Minix v. Canarecci,* 597 F.3d 824, 832 (7th Cir. 2010). "A plaintiff can establish an official policy through (1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Teesdale v. City of Chi.,* 690 F.3d 829, 834 (7th Cir. 2012) (internal citations omitted).

Quinn contends that Wexford's widespread practice of failing to ensure that referral appointments for outside procedures were actually scheduled resulted in increased and prolonged pain to Quinn and other inmate patients. In response, Wexford contends that there is insufficient evidence for such a claim.

Wexford's Rule 30(b)(6) designee, Dr. Fisher, testified that, when he took over his role in August 2012, a large number of authorized appointments and procedures were not happening. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 54. Additionally, despite Wexford's policy requiring personnel to determine why authorized services were not happening, there were numerous instances when this did not take place. Defs.' LR

17

56.1(a)(3) Stmt., Ex. E., Fisher Dep. at 72. Dr. Fisher admitted that Wexford "should be checking to make sure that these authorizations actually occur," *id.* at 75:1–4, and that its efforts to curb deficiencies in executing the policy were ongoing and "strengthened . . . within 2015," *id.* at 70:6–9.

As such, there is evidence in the record from which a reasonable jury could find that, during the relevant time period, Wexford had a practice of failing to ensure that follow-up appointments were taking place and that these incidents were widespread. Summary judgment as to this issue is denied.

### III. Punitive Damages

Finally, Defendants seek summary judgment to prevent Quinn from seeking punitive damages. "Punitive damages are recoverable in § 1983 actions where the defendant had a reckless or callous disregard to the federally protected rights of others." *Woodward*, 368 F.3d at 930 (citing *Smith v. Wade,* 461 U.S. 30, 35 (1983)). "This is the same standard as for § 1983 liability, '[b]oth require a determination that the defendants acted with deliberate indifference or reckless disregard . . . .'" *Id.* (quoting *Walsh v. Mellas,* 837 F.2d 789, 801 (7th Cir. 1988)); *see also, e.g., King v. Chapman*, No. 09 C 1184, 2014 WL 7450433, at *2 (N.D. Ill. Dec. 30, 2014) (citing *Woodward*, 368 F.3d at 930). As such, the evidence in the record is sufficient to place the issue of punitive damages before a jury. Defendants' motion for summary judgment as to this issue is denied.

### <u>Conclusion</u>

For the reasons stated herein, Defendants' motion for summary judgment [108] is denied in its entirety. A status hearing will be held on April 4, 2018 at 9:00

18

a.m. The parties should be prepared at the hearing to set deadlines for pretrial filings and a date for the pretrial conference and trial.

**IT IS SO ORDERED.**          ENTERED   3/7/18

_____
**John Z. Lee**
**United States District Judge**